RENDERED: OCTOBER 23, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0855-WC

REYNOLDS CONSUMER PRODUCTS                                        APPELLANT

v.            PETITION FOR REVIEW OF A DECISION
              OF THE WORKERS' COMPENSATION BOARD
                    ACTION NO. WC-19-80527

WILLIAM BELL III; HONORABLE JOHN
MCCRACKEN, ADMINISTRATIVE LAW JUDGE;
and WORKERS' COMPENSATION BOARD                                  APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; KRAMER AND MCNEILL, JUDGES.

KRAMER, JUDGE: William Bell III sought workers' compensation benefits from

his employer, Reynolds Consumer Products, claiming he had sustained a

compensable injury to his right eye after suffering a fall on his employer's

premises on April 6, 2019. The Administrative Law Judge (ALJ) dismissed Bell's

claim after determining Bell had failed to prove his fall qualified as a work-related injurious event under Kentucky workers' compensation law or that his fall had been the proximate cause of his eye injury. Bell then appealed to the Workers' Compensation Board (Board). Upon review, the Board reversed and remanded, explaining Bell's eye injury was indeed work-related because Bell's fall was "unexplained" and because the evidence overwhelmingly demonstrated Bell's fall had caused his injury. Reynolds now appeals. We affirm.

The evidence adduced in this case is as follows. Bell testified that he passed out while at work for Reynolds on April 6, 2019. He had never passed out before and had felt "normal" when he arrived at work that day. At the time of his fall, he was standing near a transfer cart. Bell testified he has no idea what he hit when he fell. He blacked out and the next thing he remembers is Jermaine Campbell standing over him. Bell stated he did not have loss of vision in his right eye until after the fall. When he awoke, he did not initially realize he could not see out of his right eye. Just prior to passing out, he did not feel well and was sweating. He suddenly became disoriented and fell. At the time of his fall, the transfer cart was near him and he held a wireless crane remote in his hand. The crane remote was approximately ten to eleven inches long and five inches wide and was beside him when he awoke.

Jermaine Campbell testified by deposition on November 19, 2019. He was working approximately twenty to twenty-five feet away from Bell immediately prior to the fall. Campbell testified he had spoken with Bell earlier in the shift; they had been "talking on and off" during their shift and Bell seemed "okay." About two hours into their shift, though, Campbell glanced in Bell's direction and noticed he was standing and "just staring." Campbell yelled to Bell, who did not respond. Campbell walked toward Bell, who started walking toward him. Bell was wearing a hard hat, safety shield, and safety glasses. He was also carrying a remote control for a crane. Campbell saw Bell fall and stated Bell's body rolled while he was falling. Campbell was not sure if Bell struck anything as he fell. Bell's hardhat, face shield, and safety glasses came off when he hit the floor. When Campbell reached Bell, Bell was approximately twelve inches from the transfer cart, a permanent immovable structure. Bell was face down with his hardhat and safety glasses a few feet away. The face shield was still attached to the hardhat, but it was bent. Campbell helped Bell to a seated position and observed blood coming out of his right eye.

Campbell, with the assistance of another Reynolds employee (William Cole Duley), escorted Bell to the supervisor's office. Regarding that time frame, Campbell further testified:

Q: As he walked to the office, did [Bell] complain of any particular complaints, particularly with regard to his right eye?

CAMPBELL: No.

Q: Did he tell you whether or not he could or could not see out of the right eye?

CAMPBELL: Well, he didn't – at the time he didn't. I noticed it, but he didn't tell me that he couldn't see until I guess he came to the guard office and they checked him out and he came back to get his stuff because he was going home. At that time I noticed that his eye was swollen shut. I asked him about his eye and he told me he could not see out of his eye.

Q: Do you remember what the timeframe was between the point that he was at the guard shack waiting to be picked up, I believe, by his girlfriend? Do you know what time that would have been?

CAMPBELL: I'd say somewhere between forty-five minutes and maybe an hour.

William Cole Duley testified at the hearing. Duley works in security and loss prevention. He did not witness the accident but provided first aid afterward. When Duley first saw Bell, he was in a seated position with a paper towel over his right eye. Duley observed redness in the white part of the eye but stated nothing was coming out of the eye. He gave Bell some wet rags "because it was hot back there" but provided no other care. He noted Bell was taken from the premises by his fiancée.

-4-

Bell's fiancée, Kristin Lucas, testified at the hearing. She took Bell directly to the Baptist East emergency room. Lucas testified as follows concerning Bell's condition when she arrived at Reynolds:

> Q: And when you picked up Mr. Bell can you tell us what you saw as in relation to his eye?
>
> A: Well, when he came out he had like a wet paper towel on his eye and it was like a rust color I'm assuming from where he was wiping or oozing something that was coming out of his eye. And I asked him to open up his eye because it was like closed, like stuck closed, and he kind of pulled it open and it was just like – it was very gruesome. It was almost like smooshed.
>
> Q: What was smooshed, the white part?
>
> A: His eye – his entire eyeball, like the whole thing.
>
> Q: So was it one side smooshed more than the other side or just –
>
> A: It looked – honestly, just the whole thing was just like a big glob.
>
> Q: Did it look bloody as well?
>
> A: Yes. It was very red and had oozing stuff coming out of it.

Records from Baptist Health Louisville on April 6, 2019, the day of the accident, reflect Bell sustained a ruptured globe of the right eye. Bell had a dilated, non-reactive right pupil with blood in the anterior chamber, and "[l]arge amounts of tearing and drainage" were observed. A CT of the head was read as

showing an abnormal appearance of the right globe, likely related to a prior corneal transplant. Bell was transferred to the University of Louisville for surgery.

Bell filed the October 18, 2019 report of Dr. Richard A. Eiferman. He opined as follows:

> In my opinion, Mr. Bell's eye injury was a result of direct trauma to the right eye. Given the severity of his injury (traumatic wound dehiscence with a prolapse of the intraocular contents and ultimate loss of vision) and the unaffected left eye (which also had a pre-existing corneal transplant) it is highly unlikely that it was caused by a blunt force trauma to the skull. In addition, Mr. Bell's injury could not have been caused by any other non-traumatic event such as hypertension.
>
> The opinions above are based on over 40 years of clinical experience and are expressed within a reasonable degree of medical probability.

Bell's claim was bifurcated on the issue of work-relatedness of the eye injury. The ALJ's findings relevant to this appeal were as follows:

> An employee has the burden of proof and the risk of non-persuasion to convince the trier of fact of every element of his workers' compensation claim. Snawder v. Stice, 576 S.W.2d 276 (Ky. App. 1979). Injury is statutorily defined in KRS 342.0011(1) as a work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment, which proximately causes a harmful change in the human organism evidenced by objective medical findings.
>
> When the causal relationship between an injury and a medical condition is not apparent to a lay person, the issue of causation is solely within the province of a medical expert. Elizabethtown Sportswear v. Stice, 720

S.W.2d 732, 733 (Ky. App. 1986); Mengel v. Hawaiian-Tropic Northwest and Central Distributors, Inc., 618 S.W.2d 184 (Ky. [App.] 1981).

Whether a workplace injury arises out of employment requires considering three risk categories: 1) risks distinctly associated with employment; 2) risks that are idiopathic or personal to the worker; and 3) risks that are neutral. Vacuum Depositing, Inc. v. Dever, 285 S.W.3d 730, 733 (Ky. 2009). Bell's fall does not fit into category one. "Unexplained falls begin with a completely neutral origin of the mishap, while idiopathic falls begin with an origin which is admittedly personal." Id.

Kentucky has adopted a presumption that unexplained workplace falls arise out of the employment unless the employer presents substantial evidence to show otherwise. Id. "The employer cannot prevail in such a case unless it shows affirmatively that the fall was not work-related." Id.

Idiopathic falls may be compensable if work places the injured worker in a position that increases its dangerous effects. Id.; see also Indian Leasing Company v. Turbyfill, 577 S.W.2d 24 (Ky. App. 1979). This increased dangerous effect may be a fall from a height, near machinery or sharp corners, or in a moving vehicle. Turbyfill at 24. The Court in Turbyfill stated the issue in idiopathic falls must be carefully distinguished from the medical question whether the final injury was in fact the result of the fall itself, rather than the idiopathic condition. Id.

In the present case, Bell stated that he passed out. He does not know what happened from the time he passed out until he came to with Campbell standing over him. Bell stated that just prior to the fall he felt ill and sweaty. There is no proof in the record to indicate that his work caused his feeling ill and sweaty just prior to his fall, differentiating him from a person whose work-related

-7-

physical exertion may cause a heart attack who falls to the ground. While it may appear as though Bell's fall is unexplained, the evidence points to the fact that he fainted. He admitted that he passed out. Campbell saw him pass out and fall. The ALJ understands an "unexplained" fall to be one that has no explanation. Bell has an explanation for his fall in that he passed out. The ALJ relies on Bell and Baptist Hospital East records to find that he suffered a syncope episode and collapsed. Therefore, the fall is explained. The only remaining question is whether the syncope was caused by some condition of his work. There is no proof that his work caused the syncope episode. The ALJ relies on Bell and the medical records to find that Bell's fall fits the category of falls related to idiopathic and not "unexplained."

The second step in determining whether an idiopathic fall is compensable is to determine whether Bell's work placed him in a position of increasing the dangerous effects of such a fall, such as on a height, near machinery or sharp corners, or in a moving vehicle. Bell asserts that wearing his safety glasses and hardhat with face shield placed him at a greater risk of injury. He also asserts that his proximity to the platform and the handheld remote increased his risk in a fall.

Bell testified that he does not know if he fell on anything. The only eyewitness, Campbell, testified that he does not know if Bell fell onto anything as he fell. Campbell found him face down on the ground. Campbell remembers seeing Bell's hardhat, shield and safety glasses coming off Bell when he struck the floor. He described the plastic shield as being a little "cockeyed." No one knows if Bell's hearing protection came off his head. Additionally, there is no proof that Bell struck the platform with his body when he fell, or that the handheld wireless remote device he held struck his eye. There is simply no proof that his safety gear, or anything near him, increased his risk of this injury. No one testified

that his safety glasses were broken or had blood on them. It is the same for the other gear Bell was using at the time of his fall.

Dr. Eiferman, Bell's eye doctor, stated that Bell's eye injury was the result of direct trauma to the right eye, not blunt force trauma to the skull from the fall. There is no proof that Bell sustained direct trauma to the right eye when he fell. There is speculation as to what may have happened, but no proof. The Baptist Health Louisville records do not help on the issue of causation. The CT of the head was interpreted to show the right eye had an abnormal appearance of the right globe, likely related to the prior corneal transplant. There is no other explanation as to how this interpretation relates to the cause of Bell's eye condition.

The ALJ relies on Bell, Campbell, Dr. Eiferman and the Baptist Health Louisville records to find that Bell's job did not place him at a greater risk of injury. There is simply no proof that Bell struck, or was poked by, anything causing direct trauma to his right eye.

The ALJ finds that Bell has not met his burden of proof that his April 6, 2019 fall produced an injury in the course and scope of his work.

In sum, the ALJ found Bell had failed to prove it was more likely that not that his fall had caused the trauma to his right eye. Moreover, the ALJ held, even if the fall *had* proximately caused Bell's injury, it was still non-compensable because the fall was "idiopathic"; in other words, Reynolds was not responsible because Bell had admitted he had "passed out" after feeling ill and weak; and because Bell had failed to prove – as is necessary regarding idiopathic falls – that

-9-

his "work placed him in a position of increasing the dangerous effects of such a fall[.]"

In a petition for reconsideration before the ALJ, and in his subsequent appeal before the Board, Bell contested these findings. As to causation – which we will address in this appeal first – Bell asserted that the evidence overwhelmingly demonstrated his fall had caused the direct trauma that had undisputedly caused his right eye injury. The ALJ denied Bell's petition for reconsideration regarding causation. However, the Board reversed on this point, explaining "there is no question that the eye injury occurred while Bell was at work at Reynolds," and that "before Bell fell on April 6, 2019, his eyes were functioning and the fall resulted in significant damage to Bell's right eye."

Reynolds now appeals, arguing nothing of record directly proved Bell's fall caused him to sustain the trauma necessary to cause his right eye injury, and that the Board accordingly erred in reversing the ALJ. We disagree. As stated in *Kroger v. Ligon*, 338 S.W.3d 269, 273 (Ky. 2011):

> A party who fails to meet its burden before the ALJ must show on appeal that the unfavorable finding was clearly erroneous because overwhelming evidence compelled a favorable finding, *i.e.*, that no reasonable person could have failed to be persuaded by the favorable evidence. Evidence that would have supported but not compelled a different decision is an inadequate basis for reversal on appeal.

(Footnotes and citations omitted.)

With that said, while it is true that no evidence *directly* proved Bell's fall sustained the trauma necessary to cause his right eye injury, the *circumstantial* evidence was overwhelming. To review, it reflected the following:

- Bell testified he had arrived at work on April 6, 2019, feeling normal. For two hours, he had been working in his usual location. No evidence suggests he sustained any injury to his right eye prior to arriving at work that day. He testified that prior to his fall, he was able to see out of his right eye.

- Prior to his fall, Campbell, who had been talking with him earlier in his shift, had noticed nothing wrong with Bell – he seemed "okay."

- When he fell, Bell was either holding equipment or was in an area *capable* of causing trauma to his right eye, depending upon *how* he fell.

- Campbell was the only individual who witnessed Bell fall. He could not recall if Bell struck anything during the fall. After the fall, however, Campbell noticed, for the first time, there were signs that Bell had recently sustained trauma to his right eye. Specifically, Bell had blood coming out of his right eye; approximately forty-five minutes later, he noticed Bell's right eye was "swollen shut," and Bell complained to Campbell for the first time that he could not see out of his right eye.

- Bell testified that the first time he lost vision in his right eye was after he had passed out.

- Lucas testified that after Bell's fall, when she picked Bell up from work, she also noticed signs of recent trauma to Bell's eye (*i.e.*, a "rust-colored" substance had soaked into the paper towel Bell had been using to wipe his right eye; and Bell's right eye appeared "smooshed").

- Nothing of record demonstrates Bell sustained trauma to his right eye between when Campbell assisted him after the fall, and when Bell was treated at the hospital.

Considering that evidence, we agree with the Board that the ALJ erred in this respect.

Moving on, the next issue presented on appeal is the *type* of fall Bell sustained on April 6, 2019. As indicated, Reynolds argued and the ALJ found Bell's fall was "idiopathic," and thus not work-related, because Bell had admitted to passing out; because the hospital's documentation indicated his fall had been due to a "syncope episode"; and because "[t]here is no proof in the record to indicate that his work caused his feeling ill and sweaty just prior to his fall." However, the Board opined Bell's fall had been "unexplained," and thus presumptively work-related, because substantial evidence did not demonstrate that any internal weakness or medical condition on Bell's part had caused his feeling ill and sweaty just prior to his fall, either – or otherwise explain *why* Reynolds had passed out. Reversing the ALJ, the Board determined Bell's fall was properly

categorized as "unexplained"; Reynolds consequently had the burden below to present substantial evidence to rebut that presumption with substantial evidence; and because Reynolds had produced no such substantial evidence, the injuries Bell sustained due to the fall were compensable. Upon review, we agree with the Board in this respect, as well. We adopt the Board's reasoning as follows:

> A review of Kentucky law on the issue begins with the case of Workman v. Wesley Manor Methodist Home, 462 S.W.2d 898 (Ky. 1971), where benefits were denied to an employee who fell and broke her hip in the course of her employment. The facts indicated that the employee did not slip or stumble but fell after her back gave way due to an injury previously suffered in one or possibly two automobile accidents. The Court held that "an injury from a fall resulting during the course of the employment but solely from a cause or causes to which the work is not a contributing factor is not compensable." Id. at 901. The Court further noted that, under the "positional risk theory," benefits may be allowed for injuries sustained in a fall "if the employment places the employee in a position increasing the dangerous effects of such a fall, such as on a height, near machinery or sharp corners, or in a moving vehicle." Id. (quoting Larson, *Workmen's Compensation Law*, § 12.11).
>
> The Workman Court acknowledged there is a rebuttable presumption that an unexplained fall during the course of employment is work-related. However, the Court found that the rebuttable presumption had been reduced to a permissible inference by evidence that the employee's fall was not unexplained but, rather, resulted solely from a prior, non-work-related back condition. Consequently, the "old" Board was not compelled to find that the employment was a causative factor in the employee's injuries.

-13-

The continuing viability of the <u>Workman</u> decision was addressed in <u>Jefferson County Public Schools/Jefferson County Board of Education v. Stephens</u>, 208 S.W.3d 862 (Ky. 2006), in which the Supreme Court upheld a determination by the ALJ that the claimant sustained a work-related injury when she fell walking from a carpeted surface to a tile floor. There was evidence introduced the claimant might have experienced dizziness prior to her fall. However, the ALJ believed the claimant's testimony that she did not experience any such dizziness. The Court stated as follows:

> The burden is on an injured worker to prove every element of her claim, including that a workplace injury arose out of the employment. <u>See</u> <u>Workman v. Wesley Manor Methodist Home</u>, 462 S.W.2d 898 (Ky. 1971); <u>Stasel v. American Radiator & Standard Sanitary Corp.</u>, 278 S.W.2d 721 (Ky. 1955). As explained in Arthur Larson and Lex K. Larson, <u>Larson's Workers' Compensation Law</u>, § 4 (2006), an analysis of whether a work-related injury arises out of employment begins with a consideration of three categories of risk: 1.) risks distinctly associated with employment (e.g., machinery breaking, objects falling, explosives exploding, fingers getting caught in machinery, exposure to toxic substances); 2.) risks that are idiopathic or personal to the claimant (e.g., a disease, internal weakness, personal behavior, or personal mortal enemy that would have resulted in harm regardless of the employment); and 3.) neutral risks (e.g., a stray bullet, a mad dog, a running amuck, lightning). Where an employment and personal cause combine to produce harm, the law does not weigh the importance of the two causes but considers whether the employment was a contributing factor.

-14-

Although one naturally infers that a fall in the workplace has something to do with the employment, proving that it arose out of the employment can be problematic when the reason that it occurred is unexplained. Workman v. Wesley Manor Methodist Home, supra, stands for the principle that an unexplained workplace fall is presumed to arise out of the employment unless the presumption is rebutted. The court determined subsequently in Indian Leasing Company v. Turbyfill, 577 S.W.2d 24 (Ky. App. 1978), that even an idiopathic fall may be compensable if work placed the individual in a position that increased its dangerous effects.

We explained in Magic Coal Co. v. Fox, 19 S.W.3d 88, 95 (Ky. 2000), that rebuttable presumptions are governed by KRE[1] 301. Such a presumption shifts the burden of going forward with evidence to rebut or meet it to the party against whom it is directed, but it does not shift the burden of proof (i.e., the risk of nonpersuasion) from the party upon whom it was originally cast. If a presumption is not rebutted, the party with the burden of proof prevails on that issue by virtue of the presumption. If a presumption is rebutted, it is reduced to a permissible inference. The ALJ must then weigh the conflicting evidence to decide which is most persuasive.

Because a fact must be proved with substantial evidence, a rebuttable presumption must be met with substantial

---

[1] Kentucky Rule of Evidence.

evidence. Therefore, an employer asserting that a workplace fall was idiopathic must meet the presumption with substantial evidence to that effect. If the employer does so, the ALJ must weigh the conflicting evidence, including the permissible inference that a workplace fall arises out of the employment. The burden of persuasion remains on the worker.

Id. at 866-867.

As an aside, in *Jefferson County Public Schools*, the employer was deemed to have produced substantial evidence capable of meeting the presumption of work-relatedness relative to the claimant's "unexplained" fall, and to have thus reduced the presumption of work-relatedness to a permissible inference. As to the nature of that substantial evidence, the Court indicated that while nothing indicated "that the claimant developed syncope, fainted, or lost consciousness immediately before the fall," some evidence had indicated the claimant had a medical predisposition and history of suffering from blackout spells. *Id*. at 867.

And that, in turn, leads to the crux of the Board's analysis in this matter. "Fainting," "passing out," or "blacking out" can be caused by any *number* of conditions, personal or otherwise. Thus, without more, simply noting that a

claimant suffered a fall due to "fainting" merely begs the question of whether the

claimant's fall was idiopathic or unexplained.[2]

Keeping that in mind, the Board's analysis continued in relevant part

as follows:

> Bell testified he had corneal implants approximately twenty years prior to the date of his fall. After undergoing a follow up from the surgeries, Bell had not received any further treatment of his eyes. As noted by the ALJ, Bell began taking blood pressure medication after the subject fall. Bell did not know why he passed out at work. In fact, he went to see Dr. Katherine Dunbar to find out why he passed out. She ran tests which provided no explanation. He denied being treated for any other chronic conditions or being prescribed medication until he took blood pressure medication following this incident. Bell denied ever being prescribed blood pressure medication prior to his April 2019 fall. Notably, there is no evidence linking potential blood pressure problems to the fall at work. Bell testified he passed out and such an episode had never happened before. Bell explained:
>
>> Q: What's the last thing you remember before you passed out?
>>
>> A: Not feeling well at the moment, sweating. Like I said, I just got disoriented just all of a sudden. I've never had that experience before in my life. We was only

---

[2] Underscoring this point in its appellate brief, Reynolds hypothesizes (without proof) that perhaps Bell had arrived at work on April 6, 2019, with an *already-traumatized* right eye and that his already-traumatized right eye had, perhaps, caused him to pass out two hours later into his shift. However, engaging in that base level of speculation could just as easily lead to the proposition that, *perhaps*, Bell may also have passed out due to heatstroke owing to his working conditions; as noted, Bell had been exerting himself, and Duley testified he gave Bell some wet rags after Bell passed out "because it was hot back there."

going to get four coils ready. And then after we got two coils ready I started sweating and feeling bad and like I said after that I passed out. That's all I remember.

Q: When you got to work that day, were you feeling like your normal self?

A: Uh-huh.

Q: Is that a yes?

A: Yes. I'm sorry.

Q: . . . but are you telling me then that the symptoms that you had of feeling disoriented and getting a little sweaty, did those come on suddenly?

A: Yes.

The medical records of Baptist Health Louisville reflect the reason for the visit was "syncope" and Bell provided the following: "I got dizzy and sweaty today while at work and passed out hitting my head on the ground and busting my right eye." Under "Review of Systems," is the following: "Neurological: Positive for syncope. Negative for weakness, numbness and headaches." The final diagnosis was "Syncope and collapse. Ruptured globe of right eye, initial encounter." Baptist Health's records contain no explanation for how or why the alleged syncope occurred. Consequently, the cause of the alleged syncopal episode was and is unknown.

After having carefully considered the facts, the law, and arguments of counsel, we agree with Bell that the ALJ erroneously determined his fall was idiopathic and not work-related. Reynolds put forth no evidence supporting the theory that something personal to Bell caused his fall. Further, it submitted no evidence Bell possessed some

physical or medical condition that caused him to fall. Reynolds may have persuaded the ALJ that nothing it did caused the fall. That alone, however, does not shift the inference from a rebuttable presumption of work-relatedness to the permissible inference. As the Kentucky Supreme Court pointed out in Jefferson County Public Schools, supra,

> It was the employer's burden to go forward
> with substantial evidence of a non-work-
> related cause for the claimant's fall in order
> to rebut the *Workman* presumption.

Id. at 867.

Even though the hospital records contain a diagnosis of syncope as the chief complaint, those records do not explain the cause of the syncope. The medical records and Bell's testimony do not link the workplace fall to a prior condition of Bell's. Thus, we believe the ALJ erroneously concluded the fact that there was a diagnosis of syncope caused the fall to be idiopathic. That is not the test. Rather, Reynolds must come forward with some explanation as to why the syncopal episode occurred. Applying that standard, Reynolds did not meet the above-described burden. The Court of Appeals (now Supreme Court) phrased it best in Workman:

> In blunt terms this means that without such
> rebutting evidence the Board [now ALJ]
> cannot find against him on the issue of
> whether the accident arose out of the
> employment.

Id. at 900.

Unlike in Workman, Reynolds did not demonstrate the cause of the fall. In Workman, Wesley Manor introduced evidence that Workman had the following problems:

-19-

> Prior to the time of the hip injury Mrs. Workman had suffered injuries to her back in two separate automobile accidents, one on February 14, 1964, and the other on November 3, 1965, following each of which she had brought suit against other parties for her damages. The second of these two damage suits was pending at the time she broke her hip, and on March 8, 1967, in that action, she testified in a deposition as follows.

Id. at 899.

The 1967 deposition in the damage suit was introduced as evidence against Workman during the course of the workers' compensation proceeding. The Board concluded Workman's fall was idiopathic due to her pre-existing back problems and dismissed her claim. The Court of Appeals (now Supreme Court) explained the importance of Workman's previous testimony in the personal injury action involving an injury to the same area of the back:

> Mrs. Workman's testimony in this proceeding would have entitled her as a matter of law to a favorable finding had there been no rebutting or countervailing evidence on the issue of causation, but the subsequently introduced content of what she had said while testifying in the damage suit constituted enough evidence that the accident resulted solely from the weakened condition of her back, and not in any respect from the performance of her work, to reduce the rebuttable presumption in her favor to a permissible inference, leaving the board free either to decide in her favor or to remain unpersuaded, as it did, that her work was a causative factor in precipitating the injury.

-20-

> That being the case, the circuit court was correct in not disturbing the action of the board.

Id. at 901.

Our holding is also consistent with Vacuum Depositing, Inc. v. Dever, 285 S.W.3d 730, 733-734 (Ky. 2009), in which the Supreme Court stated as follows:

> Kentucky has adopted a presumption that an unexplained workplace fall arises out of the employment unless the employer presents substantial evidence to show otherwise. [footnote omitted] The employer cannot prevail in such a case unless it shows affirmatively that the fall was not work-related. The employer in *Workman* did so by showing that Ms. Workman's testimony in the workers' compensation claim conflicted with her testimony in an unrelated civil suit that her back had been symptomatic and caused her to fall before the incident at work. The court determined that the employer offered sufficient evidence that the fall was idiopathic to negate the presumption that it was not.
>
> The court explained subsequently in *Turbyfill* that an idiopathic fall may be compensable if work places the injured worker in a position that increases its dangerous effects. [footnote omitted] *Turbyfill's* employer negated the *Workman* presumption by showing that his fall resulted from a non-work-related heart attack. The court found the fall to be compensable, however, because the fact that he was working 12 feet off the ground increased the fall's effects.

-21-

To summarize, a work-related fall occurs if the worker slips, trips, or falls due to causes such as a substance or obstacle on the floor of the workplace or an irregularity in the floor. When the cause of a workplace fall is unexplained, the fall is presumed to be work-related under *Workman*. Unexplained falls divide ultimately into two categories: 1.) those the employer has shown to result from a personal or idiopathic **cause** but which may be compensable under the positional risk doctrine; and 2.) those that remain unexplained and entitled to a presumption of work-relatedness. **(emphasis added.)**

The claimant alleged an unexplained fall but, as in *Workman*, the ALJ found that the employer rebutted the presumption of work-relatedness and showed the fall to be personal or idiopathic. The employer asserts that the Board erred by substituting its judgment for the ALJ's and, thus, that the Court of Appeals erred by affirming the Board. We disagree.

In the case *sub judice*, the medical records reflect a diagnosis of syncope but do not show its cause or, more importantly, relate it to a non-work-related cause. Thus, the employer as required in <u>Dever</u> did not show the fall resulted from a personal or idiopathic cause. The following language from <u>Dever</u> is directly applicable to this case:

The ALJ characterized the claimant as "not an entirely credible witness" but determined that a workplace fall occurred although its cause was idiopathic. The fact that the claimant's work did nothing to cause her fall was immaterial under *Workman*. The record

-22-

contained no evidence that she suffered from **a pre-existing disease or physical weakness that caused her to fall** and no evidence that she was engaged in conduct when she fell that would take the injury outside Chapter 342.  Nor did the record contain evidence that her footwear was inherently dangerous and inappropriate for work in the employer's officers.  Like the Board and the Court of Appeals, we are convinced that evidence the claimant was clumsy and wearing high heels was not sufficient to prove that the cause of her fall was idiopathic.  The evidence did not overcome the presumption that the fall was unexplained and, thus, that it was work-related.

Id. at 734. **(emphasis added.)**

The record contains no evidence, as mandated by Dever, Bell suffered from a pre-existing disease or physical weakness causing his fall.  There is no evidence he was predisposed to a syncopal episode when he fell, thereby removing the fall and injury from the work-related realm.  In the case *sub judice*, there is no such evidence establishing, as mandated by Dever, that Bell suffered from a pre-existing disease or condition rendering him likely to suffer a syncopal episode resulting in a fall.  That being the case, Bell's fall was unexplained.

In light of the foregoing, we agree with the Board's decision to reverse the ALJ, due to Reynolds' failure to adduce substantial evidence demonstrating Bell's fall was idiopathic; its decision to remand for a finding that the fall was unexplained and that the physical effects of the fall are compensable; and its directions for the ALJ, in light of the overwhelming evidence of causation

-23-

discussed above, to accordingly find Bell's injury to his right eye compensable,

and to hold any other proceedings not inconsistent therewith.  Accordingly, we

AFFIRM.


ALL CONCUR.


BRIEF FOR APPELLANT:

Lyn Douglas Powers
Louisville, Kentucky

BRIEF FOR APPELLEE WILLIAM
BELL III:

Mark B. Wallace
Louisville, Kentucky